**SO ORDERED.**

**SIGNED this 26 day of September,2014.**

_Stephani W. Humrickhouse_
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                              CASE NO. 09-10340-8-SWH

**NEW BERN RIVERFRONT DEVELOPMENT, LLC,**
   **DEBTOR**


**NEW BERN RIVERFRONT DEVELOPMENT, LLC,**
   **Plaintiff,**                    ADVERSARY PROCEEDING NO.

   **v.**                             **10-00023-8-AP**


**WEAVER COOKE CONSTRUCTION, LLC; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; J. DAVIS ARCHITECTS, PLLC; FLUHRER REED PA; and NATIONAL ERECTORS REBAR, INC. f/k/a NATIONAL REINFORCING SYSTEMS, INC.,**
   **Defendants,**

   **and**

**WEAVER COOKE CONSTRUCTION, LLC; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,**
   **Defendants, Counterclaimants, Crossclaimants and Third-Party Plaintiffs,**

   **v.**

**J. DAVIS ARCHITECTS, PLLC, FLUHRER REED PA, SKYSAIL OWNERS ASSOCIATION, INC.; NATIONAL REINFORCING SYSTEMS, INC., ROBERT P. ARMSTRONG, JR., ROBERT ARMSTRONG, JR., INC., SUMMIT DESIGN GROUP, INC., CAROLINA CUSTOM MOULDING, INC., CURENTON CONCRETE WORKS, INC., WILLIAM H. DAIL d/b/a DD COMPANY, EAST CAROLINA MASONRY, INC., GOURAS, INC., HAMLIN ROOFING SERVICES, INC., HUMPHREY HEATING & AIR CONDITIONING, INC.; PERFORMANCE FIRE PROTECTION, LLC; RANDOLPH STAIR AND RAIL COMPANY; STOCK BUILDING SUPPLY, LLC; PLF OF SANFORD, INC. f/d/b/a LEE WINDOW & DOOR COMPANY; UNITED FORMING, INC. a/d/b/a UNITED CONCRETE, INC.; JOHNSON'S MODERN ELECTRIC COMPANY, INC.; and WATERPROOFING SPECIALITIES, INC.,**

  **Crossclaimants, Counterclaimants and Third-Party Defendants.**


  **and**

**NATIONAL ERECTORS REBAR, INC.**
  **Defendant, Counterclaimant, Crossclaimant and Third-Party Plaintiff,**

  **v.**

**ROBERT P. ARMSTRONG, JR., ROBERT ARMSTRONG, JR., INC., SUMMIT DESIGN GROUP, INC., JMW CONCRETE CONTRACTORS, and JOHNSON'S MODERN ELECTRIC COMPANY, INC.**
  **Third-Party Defendants.**

  **and**

**J. DAVIS ARCHITECTS, PLLC,**
  **Third-Party Plaintiff,**

   **v.**

**MCKIM & CREED, P.A.,**
  **Third-Party Defendant.**

  **and**

**GOURAS, INC.,**
  **Third-Party Defendant and**
  **Fourth-Party Plaintiff,**

   **v.**

**RAFAEL HERNANDEZ, JR., CARLOS**
**CHAVEZ d/b/a CHAVEZ DRYWALL,**
**5 BOYS, INC. and ALEX GARCIA**
**d/b/a/ JC 5,**
  **Fourth-Party Defendants.**

  **and**

**STOCK BUILDING SUPPLY, LLC,**
  **Third-Party Defendant and**
  **Fourth-Party Plaintiff,**

   **v.**

**CARLOS O. GARCIA, d/b/a/ C.N.N.C.,**
  **Fourth-Party Defendant.**

### ORDER ALLOWING MOTION OF HAMLIN ROOFING COMPANY, INC. FOR SUMMARY JUDGMENT ON INDEMNITY CLAIM

  Pending before the court is the final component of the motion for summary judgment filed by third-party defendant Hamlin Roofing Company, Inc. ("HRCI") against Weaver Cooke Construction, LLC ("Weaver Cooke"), in its capacity as third-party plaintiff. The court already entered an order denying HRCI's motion for summary judgment with respect to two of Weaver

Cooke's three claims against it (for negligence and breach of express warranty), which HRCI sought on grounds that the claims were barred by the applicable statutes of limitation and by the economic loss rule. This order addresses a remaining claim, in which Weaver Cooke asserts that HRCI must indemnify it for its losses. On August 22, 2014, the court entered summary judgment with respect to Weaver Cooke's indemnity claim against defendants Stock Building Supply, LLC and PLF of Sanford, Inc. (formerly dba Lee Window & Door Co.) (herein collectively "Stock Supply") on grounds that are equally applicable to HRCI. Accordingly, for the reasons outlined below, the court will enter summary judgment in favor of HRCI on this claim as well.

## BACKGROUND

New Bern Riverfront Development, LLC ("New Bern") is the owner and developer of the SkySail Luxury Condominiums ("SkySail Project") located in New Bern, North Carolina. On March 30, 2009, New Bern initiated an action in Wake County Superior Court against nine individual defendants related to their roles in the construction of the SkySail Condos (the "State Action"). The named defendants in the State Action included New Bern's general contractor, Weaver Cooke; Travelers Casualty and Surety Company of America ("Travelers"); National Erectors Rebar, Inc. f/k/a National Reinforcing Systems, Inc. ("NER") and certain subcontractors of the general contractor.

On November 30, 2009, New Bern filed a petition for relief under chapter 11 of the Bankruptcy Code. The State Action was removed to the United States District Court for the Eastern District of North Carolina on December 16, 2009, and subsequently transferred to this court on February 3, 2010. After voluntarily dismissing its causes of action as to the subcontractors named as defendants in the State Action, New Bern filed its first amended complaint on May 6, 2010,

asserting claims against the original parties of Weaver Cooke, Travelers, and NER, and the additional parties of J. Davis Architects, PLLC, and Fluhrer Reed, PA.

On May 27, 2010, Weaver Cooke filed an answer to New Bern's first amended complaint and a third-party complaint against Wachovia Bank, N.A. and Wells Fargo & Company f/d/b/a Wachovia Corporation.  Absent as third-party defendants in Weaver Cooke's original third-party complaint were any of the subcontractors hired by Weaver Cooke during the construction of the SkySail Project.  On June 14, 2012, Weaver Cooke filed its second, third-party complaint asserting claims of negligence, contractual indemnity and breach of express warranty against many of the subcontractors hired during the construction of the SkySail Project, including HRCI, along with Stock Building Supply, LLC and PLF of Sanford, Inc.  HRCI filed an answer to Weaver Cooke's second, third-party complaint on August 13, 2012, asserting numerous defenses, including the statute of limitations.

On December 20, 2013, Stock Supply filed a motion for summary judgment regarding all three causes of action alleged against it by Weaver Cooke.  HRCI also filed its motion for summary judgment on December 20, 2013, asserting similar grounds.  In support of its motion, which is the motion on which the court ruled first, Stock Supply argued that (1) the applicable statute of limitations bars Weaver Cooke's claims of negligence and breach of express warranty; (2) the economic loss rule bars Weaver Cooke's negligence claim; and (3) N.C. Gen. Stat. § 22B-1 bars Weaver Cooke's contractual indemnity claim.

The court dealt first with the statute of limitations issue, and entered an order denying HRCI's motion for summary judgment on its statute of limitations defense on September 18, 2014. (An order granting summary judgment in favor of Stock Supply with respect to its statute of

limitations defense to the negligence and breach of express warranty claims was entered June 10, 2014.)  An order denying HRCI's  motion for summary judgment on the economic loss rule defense was entered on September 22, 2014.

HRCI's motion for summary judgment on Weaver Cooke's claim for indemnification remains, along with its motion based on contributory negligence, which will be addressed in a separate order.  On August 22, 2014, the court granted Stock Supply's motion for summary judgment on the indemnity claim.  The discussion that follows is identical in substance to the discussion in that order because the indemnity provisions in the contract between Weaver Cooke and HRCI are identical to the provisions at issue in that order; further, the legal bases upon which the court granted Stock Supply's motion for summary judgment on Weaver Cooke's indemnity claim are identical in most respects to the reasons for which the court now grants HRCI's motion for summary judgment on Weaver Cooke's indemnity claim.

## DISCUSSION

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986) (quoting Fed. R. Civ. P. 56(c)).  In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) (per curiam).  Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out "claims and defenses [that] have no factual basis."  Celotex, 477 U.S. at 327, 106 S. Ct. at 2555.

With respect to the non-core matter now before the court, there is no dispute as to the

relevant facts, contractual language, or applicable law.  The court has jurisdiction to enter this order

allowing summary judgment, in light of the right of *de novo* review by the district court.   Ward v.

United States Dept. of Educ., Case No. 5:13-CV-695-D (E.D.N.C. June 18, 2014), citing Exec.

Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165 (2014).

The court's analysis is governed by North Carolina state law, and in particular N.C. Gen.

Stat. § 22B-1, which provides:

> Any promise or agreement in, or in connection with, a contract or agreement relative
> to the design, planning, construction, alteration, repair or maintenance of a building,
> structure, highway, road, appurtenance or appliance, including moving, demolition
> and excavating connected therewith, *purporting to indemnify and hold harmless the
> promisee*, the promisee's independent contractors, agents, employees, or indemnitees
> against liability for damages arising out of bodily injury to persons or *damage to
> property proximately caused by or resulting from the negligence, in whole or in part,
> of the promisee*, its independent contractors, agents, employees, or indemnitees, is
> against public policy and is void and unenforceable.  Nothing contained in this
> section shall prevent or prohibit a contract, promise or agreement whereby a promisor
> shall indemnify or hold harmless any promisee or the promisee's independent
> contractors, agents, employees or indemnitees against liability *for damages resulting
> from the sole negligence of the promisor, its agents or employees*.

N.C. Gen. Stat. § 22B-1 (emphasis added).

The contractual indemnification language at issue is set out in Article 16 of Weaver Cooke's

subcontract ("the Subcontract") with HRCI, as follows:

Article 16<br>Indemnification

16.1   Subcontractor shall be responsible to Contractor for the acts and omissions of
Subcontractor's employees, sub-subcontractors and their agents and employees, and
other persons performing portions of Subcontractor's Work under a contract with
Subcontractor.

16.2   To the fullest extent permitted by law, Subcontractor shall indemnify and hold

7

harmless Contractor, its agents and employees from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from Subcontractor's performance of Subcontractor's Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than Subcontractor's Work itself) including loss of use resulting therefrom, if caused in whole or in part by the negligent acts or omissions of Subcontractor, a sub-subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, *regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.* Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity, which would otherwise exist as to a party or person described in this Article.

HRCI Mem. in Supp. of Mot. for Sum. J. Ex. 1 ("Subcontract") at 9 ¶¶ 16.1, 16.2 (emphasis added).

This language is included in all of the Weaver Cooke's subcontracts, such that the court's analysis in the context of this particular motion (insofar as it is based on operation of law, and not unique facts) will apply with respect to Weaver Cooke's indemnity claims against other third-party defendants as well.

In its motion, HRCI argues that Weaver Cooke's indemnity claim is precluded by N.C. Gen. Stat. § 22B-1, which provides that where an indemnity provision in a construction contract "purport[s] to indemnify or hold harmless the promisee" for injury or damages resulting from the "'negligence, in whole or in part, of the promisee ... is against public policy and is void and unenforceable,'" and further that Weaver Cooke's own contributory negligence bars the claim. HRCI Mem. at 19-21. In particular, HRCI points out that Weaver Cooke was responsible for the sequencing of the process by which the building envelope was constructed, which involved coordination and supervision of work by HRCI (installing most aspects of roof, including waterproof roof membrane) and Carolina Custom Moulding, Inc. ("CCMI") (build and install high parapet systems), in addition to the work of other subcontractors and third-party defendants, including East

Carolina Masonry, Inc. ("ECM") (brick veneers); Randolph Stair & Rail Co. ("Randolph") ("shelf angles" and other structural aspects); Gouras, Inc. (building wrap); Stock Supply (exterior windows and doors); and Waterproofing Specialties, Inc. (waterproofing membrane). Id. at 4-11. In response, Weaver Cooke argues that N.C. Gen. Stat. § 22B-1 does not bar its claim; that the contractual indemnity language could be "blue penciled" if necessary; and that a defense of contributory negligence does not apply to contract-based actions, including the indemnity claim. In addition, Weaver Cooke asserts that its indemnity claim is independently derived from a contract implied-in-fact. Weaver Cooke Mem. in Response to Mot. for Sum. Judgment ("Weaver Cooke Mem.") at 35-51. The court will address the express contractual indemnity claim and the indemnity implied-in-fact theory in turn, beginning with the statute and the indemnity provisions set out in Article 16 of the Subcontract.

## I.   N.C. Gen. Stat. § 22B-1 as applied to Subcontract ¶¶ 16.1 and 16.2.

### A.   Paragraph 16.2

HRCI argues that ¶ 16.2 of the Subcontract runs afoul of the North Carolina statute, such that the provision is void and unenforceable, because the Subcontract specifies that HRCI is obligated to indemnify Weaver Cooke "regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder." In addition, the provision requires HRCI to indemnify Weaver Cooke for damages caused "in part" by HRCI's negligence, leaving open the question whether such damages may also be caused in part by Weaver Cooke itself. Because courts strictly construe an indemnity provision against the party asserting it, language that "might require defendant to indemnify plaintiff from plaintiff's own negligence" is deemed void. City of Wilmington v. N.C. Natural Gas Corp., 117 N.C. App. 244, 248, 450 S.E.2d 573, 576 (1994).

Weaver Cooke does not concede that the language of ¶ 16.2 violates the statute; however, it is readily apparent that it does. "Under North Carolina law, a general contractor cannot require a subcontractor to insure it against its own negligent acts." St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co., 187 F. Supp. 2d 584, 590 n.7 (E.D.N.C. 2000). When a contractor attempts to do so, as the St. Paul court noted, "any agreement relative to the construction of a building that purports to indemnify or hold harmless a general contractor against liability for damages arising out of bodily injury to a person [or damage to property] caused by or resulting from the general contractor's own negligence, in whole or in part, is against public policy and is void and unenforceable." Id. HRCI contends, correctly, that the statute also provides that where an indemnity provision purports to do so, then that "promise or agreement in, or in connection with, [the] contract" is "against public policy and is void and unenforceable." § 22B-1.

In response, Weaver Cooke argues that even if the language in the Subcontract violated § 22B-1 by essentially going too far, that violation is not fatal to its claim because the indemnity provisions are "self-limiting," and the court can strike the offending language. In particular, ¶ 16.2 is prefaced with the qualifier that it is to be applied "[t]o the fullest extent permitted by law." That limitation, Weaver Cooke contends, together with the court's ability to blue-pencil the provision as necessary, brings the provision into full compliance. In support of this argument Weaver Cooke cites Vecellio & Grogan, Inc. v. Piedmont Drilling & Blasting, Inc., 644 S.E.2d 16 (N.C. App. 2007), disc. rev. denied, 651 S.E.2d 564 (N.C. 2007), in which the North Carolina Court of Appeals took precisely this approach.

In Vecellio, a general contractor sued its subcontractor after the subcontractor provided blasting services that went awry during a road improvement project. The subcontractor challenged

enforceability of its indemnity agreement with the general contractor under § 22B-1, arguing that the agreement included a "to the fullest extent permitted by law" clause as well as "offending" language virtually identical to the language in the instant case. Id. at 20-21.  The appellate court reversed the trial court's grant of summary judgment on the indemnity claim, reasoning that the court could "merely sever the portion that is void as against public policy from an otherwise valid indemnity provision." Id. at 21 (quoting International Paper Co. v. Corporex Constructors, Inc., 385 S.E.2d 553, 555 (N.C. App. 1989)).

After the court excised the phrase "regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder," the parties were left with this language: "INDEMNITY.  To the fullest extent permitted by law, Subcontractor shall indemnify and hold harmless the Owner and Contractor ... from and against claims, damages, losses and expenses ... arising out of or resulting from performance of Subcontractor's Work." Id. at 20.  Notably, in the following paragraph, the Vecellio court said this: "Significantly, common law establishes that defendant is strictly liable for damages arising from blasting, even without an indemnity clause. Accordingly, the indemnity clause when redacted simply states the common law rule of strict liability." Id. at 21; see also International Paper Co. v. Corporex Constructors, Inc., 385 S.E.2d 553, 555 (N.C. App. 1989) (§ 22B-1 not applicable where parties stipulated that the party being indemnified was not negligent).  Weaver Cooke urges this court to follow Vecellio by striking the offending language, and enforcing what remains.

In its earlier order the court discussed the arguments advanced by Stock Supply, the gist of which was that Vecellio was wrongly decided and should not control this court's analysis. Stock Supply then went on to argue that even if the court did follow Vecellio and undertook to "blue

11

pencil" the indemnity provision in the Subcontract, that provision *even as revised* does not require Stock Supply (or, equally, HRCI) to indemnify Weaver Cooke. To illustrate: If this court were to excise the language that specifically ("regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder") and implicitly ("or in part ") purports to hold HRCI liable to Weaver Cooke for Weaver Cooke's own negligence, the provision would read as follows:

> To the fullest extent permitted by law, Subcontractor shall indemnify and hold harmless Contractor, its agents and employees from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from Subcontractor's performance of Subcontractor's Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than Subcontractor's Work itself) including loss of use resulting therefrom, *if caused in whole [redacted] by the negligent acts or omissions of Subcontractor*, a sub-subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable [*redacted*].

Thus, upon revision by the court, HRCI would be required to indemnify Weaver Cooke only for damages caused "wholly" by HRCI or its agents and employees.[1]   As Stock Supply argued persuasively in its brief, "no evidence exists that Stock or PLF solely caused Weaver Cooke's damages; nor does Weaver Cooke so contend." Stock Supply Mem. at 38 [Docket Entry 721]. Significantly, "if any other party failed to act reasonably prudent under the circumstances, and that negligence contributed to [Weaver Cooke's] loss, the indemnification provision does not apply."

---

[1] An indemnity provision of that scope is expressly allowed by the statute, as follows: "Nothing contained in this section shall prevent or prohibit a contract, promise or agreement whereby a promisor shall indemnify or hold harmless any promisee or the promisee's independent contractors, agents, employees or indemnitees against liability *for damages resulting from the sole negligence of the promisor, its agents or employees.* § 22B-1 (emphasis added).

Associated Mech. Contrs., Inc. v. HDR Eng'g Inc., 178 F.3d 1282, 1999 WL 253539 at *5 (4th Cir. 1999) (unpublished disposition) (citing § 22B-1).

As the court explained in its order allowing Stock Supply's motion for summary judgment on the indemnity claim:

> Weaver Cooke asserts that "[b]y way of the pleadings filed, the expert reports served, and expert deposition testimony provided in this action, [New Bern] now has made demand upon Weaver Cooke on account of alleged deficiencies in the work performed by Stock and PLF." *Memorandum in Response to Motion for Summary Judgment of Stock Building Supply, LLC and PLF of Sanford, Inc.* (Docket Entry 768 at 53). Stock Supply, in its memorandum of law supporting its motion for summary judgment, identifies water intrusion and certain defects which caused water intrusion as conditions for which Weaver Cooke seeks to hold it responsible. (Docket Entry 721 at 15). In addition, Stock Supply notes that Weaver Cooke's allegations related to water intrusion "were not explicitly raised in any pleading. Instead, these alleged construction defects have been identified in the testimony of New Bern's experts, and Weaver Cooke informally has asserted that Stock and PLF share, with various other parties, joint and several liability for resulting damages." (Docket Entry 721 at 10 n.3). In responding to Stock Supply's motion for summary judgment, Weaver Cooke acknowledges that it seeks to hold Stock Supply responsible for damages related to water intrusion. (Docket Entry 768 at 21, 28-32).

Similarly, Weaver Cooke seeks to hold HRCI responsible for damages related to water intrusion, as is discussed more fully below. Significantly, Weaver Cooke has never contended that the damages caused by the water intrusion were *solely* a result of HRCI's defective work. Instead, Weaver Cooke asserted identical claims of negligence, breach of warranty and indemnification against multiple subcontractors, all related to each subcontractor's contribution to the water intrusion problem.

Weaver Cooke, through its various pleadings and memoranda,[2] alleges that water intrusion and problems related to it throughout the Project were caused by a combination of defects, attributable to multiple different subcontractors. The court discussed much of this in the Stock Supply order, which, to generalize, focused on water intrusion from exterior windows and doors. With regard to the claims against HRCI, and also against CCMI, the gist of the claims is that while HRCI's roofing membrane may have originally been correctly installed, it was altered in such a way as to permit leaking prior to HRCI's completion of its scope of work. As the court previously explained:

> Weaver Cooke subcontracted with HRCI to install the roofing system for the Project. Part of HRCI's work involved installing the thermoplastic polyolefin ("TPO") roofing membrane on the Project's roof. The TPO membrane is a flexible, plastic material which comes in rolled sheets and is the primary water and air barrier on the Project's roof. The Project's roof was designed such that in certain locations, the exterior walls extended above the roof-line, resulting in the roof being partially walled at those locations. The portions of the exterior walls that extended above the roof-line are known as parapet walls. HRCI was to install the TPO such that the TPO would be laid up the back of the roof's parapet walls, over the top of the parapet, and then secured to the front of the parapet wall, resulting in the TPO terminating with the sheet pointing downward, towards the ground. This design was intended to prevent water from getting trapped underneath the TPO membrane and potentially causing leaks in the roof.
>
> The parapet walls were to be constructed by another subcontractor, Gouras Incorporated.[3] At the time that HRCI installed the TPO membrane on the roof, the

---

[2] The memoranda referred to by the court in connection with the Stock Supply motion include Weaver Cooke's: *Memorandum in Response to Motion for Summary Judgment of Curenton Concrete Works, Inc.* (Docket Entry 749); *Memorandum in Response to Motion for Summary Judgment of Third-Party Defendant, Gouras, Incorporated* (Docket Entry 758); *Memorandum in Response to Motion for Summary Judgment of Waterproofing Specialties, Inc.* (Docket Entry 759), and *Memorandum in Response to Motion for Summary Judgment of Stock Building Supply, LLC and PLF of Sanford, Inc.* (Docket Entry 768).

[3] See *Defendant Weaver Cooke Construction, LLC's Memorandum in Response to the Motion for Summary Judgment of Hamlin Roofing Services, Inc. and Hamlin Roofing Company,*

14

parapet walls had not yet been built. Therefore, and in order to accommodate for the later installation and attachment of the TPO over the top of and to the front of the parapet walls, HRCI left excess TPO material hanging over the edge of the unfinished building. Thereafter, another subcontractor, Carolina Custom Molding, Inc. ("CCMI") began its work on the roof. CCMI was responsible for installing the cornice work, which rested on top of the parapet walls. Once the parapet walls were built, but before the TPO had been secured to the parapet walls, CCMI began installing its cornice work. In order to complete its work, CCMI claims that it was forced to cut back the TPO membrane, resulting in the TPO no longer running down the face of the parapet walls.

Weaver Cooke claims that the cutting of the TPO membrane has contributed to water intrusion problems at the Project's roof and caused damage to the interior of certain condo units, including damage to the condo floors. Weaver Cooke alleges that HRCI contributed to these damages by failing to complete its installation of the TPO membrane and failing to communicate with the other roof subcontractors in such a way to ensure the TPO was installed correctly.

Order Denying Sum. J. Regarding Economic Loss Defense Asserted By Hamlin Roofing Company, Inc. (Sept. 22, 2014) (Docket Entry 939). HRCI points to the deposition testimony from CCMI's employees regarding CCMI's alteration of the membrane by cutting it and/or installing screws through it, along with the testimony of Weaver Cooke's field superintendent David Cline and the report of Weaver Cooke's expert George R. Barbour, to illustrate that any leaks in HRCI's membrane are attributable either in part or in whole to the actions of others, including Weaver Cooke. HRCI Mem. at 4-11. The court need not and does not assess, in this indemnity context, whether any of this testimony would establish contributory negligence on the part of Weaver Cooke, though HRCI argues that it does. Instead, what matters for present purposes is that *Weaver Cooke, in its own pleadings*, has identified multiple subcontractors whose work on the Project allegedly contributed to water intrusion and damages related to it.

---

*Inc.* (Docket Entry 763 at 5).

Previously, in the Stock Supply order, the court noted that one of the causes identified by Weaver Cooke is the pooling of water on balconies due to improper balcony slopes and inadequate "step-downs" between the balcony doors and the concrete balcony floors. The subcontractor responsible for this work was Curenton Concrete Works, Inc. ("Curenton"). The Project's concrete balconies were designed to have sufficient slope such that water on the balconies would drain away from the building. Furthermore, a step-down was to be implemented into the design of the balconies to provide a slight drop, or "step-down," at the intersection of the concrete slab for the interior living space of the condo unit and the concrete slab for the adjacent exterior balconies. The designed slope and step-downs on the balconies were intended to ensure positive drainage away from the building and the exterior doors, and also were to be designed with a smooth and even finish to further deter the pooling of water on the balconies. Weaver Cooke alleges that Curenton's work was defective in that there was insufficient balcony slope to provide for the proper drainage of water, that Curenton failed to achieve adequate step-downs, and that the concrete did not have a smooth and even finish, which according to Weaver Cooke resulted in the ponding of water on the Project's balconies. Weaver Cooke further alleges that this ponding of water on the balconies was a cause of water intrusion through the Project's exterior doors.[4]

Another defect identified by Weaver Cooke as a cause of water intrusion through the Project's windows and doors was the failure of Tyvek (a weather resistant material manufactured by DuPont that is used in the construction industry as a building wrap) to be properly sealed and

---

[4] Weaver Cooke acknowledges that the "issue presented by [New Bern] regarding the balcony slopes . . . relates to its assertion that the balcony slopes contribute to water intrusion and consequent damage to the interiors of the units." *Memorandum in Response to Motion for Summary Judgment of Curenton Concrete Works, Inc.* (Docket Entry 749 at 29).

integrated with the installation of the exterior doors and windows.    The installation of Tyvek was subcontracted to Gouras Incorporated ("Gouras").    According to Weaver Cooke, Gouras failed to properly seal the Tyvek to the Project's exterior doors and windows and the balcony floor slabs, contributing to the water intrusion problem.[5]

Yet another defect identified by Weaver Cooke as a cause of water intrusion through the Project's exterior doors was the sequence in which the waterproof traffic coating was applied to the concrete balconies in relation to the installation of the exterior balcony doors.[6]   Traffic coating is a liquid waterproofing substance applied to exposed concrete in order to prevent water penetration through the concrete and the attached structure.   The subcontractor responsible for applying the traffic coating was Waterproofing Specialties, and Weaver Cooke alleges that its defective work contributed to the water intrusion problem in that the traffic coating on the balconies was to be applied *prior* to the installation of, and underneath the threshold of, the exterior balcony doors. However, the sliding glass doors were actually installed *before* traffic coating had been applied to the concrete balconies, which resulted in the traffic coating being applied over the thresholds of the doors. Weaver Cooke alleges that this sequencing failure contributed to the water intrusion problem.[7]

---

[5] "The issues with the Tyvek not being properly sealed to the windows/doors, balcony floor slabs, and shelf angles are related to water intrusion."  *Memorandum in Response to Motion for Summary Judgment of Third-Party Defendant, Gouras, Inc.* (Docket Entry 758 at 7).

[6] Weaver Cooke also alleges that the traffic coating was installed out of sequence in relation to the installation of the brick veneer and led to water intrusion through the Project's walls. However, it is not clear whether the sequencing defect in relation to the brick veneer contributed to water intrusion through the Project's exterior *doors* and *windows* as well.

[7] In responding to Waterproofing Specialties' motion for summary judgment, Weaver Cooke notes that "[New Bern] alleges that this allegedly improper work sequence allows for water intrusion." *Memorandum in Response to Motion for Summary Judgment of  Waterproofing Specialties, Inc.* (Docket Entry 759 at 5).

Finally, Weaver Cooke also alleges that Stock Supply's failure to install sill pan flashing contributed to the water intrusion problem.  Sill pan flashing is a waterproof material that is installed beneath windows and doors to aid in drainage to the exterior of a building in the event of window and door leaks.  Weaver Cooke alleges that Stock Supply's failure to install sill pan flashing beneath the balcony sliding glass doors contributed to water intrusion and the resulting damage to the interior of certain condo units.[8]

In addition, there is evidence in the record that Weaver Cooke itself contributed to the water intrusion problem.  Certain management-level employees for Weaver Cooke admit that Weaver Cooke contributed to the sequencing error wherein the sliding glass doors were installed before the traffic coating had been applied to the concrete balconies.  Steve Tidey, Weaver Cooke's project superintendent, admitted that Weaver Cooke created a construction schedule which called for the application of the traffic coating *after* the installation of the sliding glass doors.  Tidey further acknowledged that this was a mistake on the part of Weaver Cooke.  Kevin Lloyd, Weaver Cooke's project manager and vice president, confirmed that Weaver Cooke's schedule called for the doors to be installed before the application of the traffic coating to the balconies.  Lloyd further testified that this scheduling component was an obvious error when compared to the architectural details, which called for the application of the traffic coating prior to the installation of the exterior doors.[9]

---

[8] See Weaver Cooke's *Memorandum in Response to Motion for Summary Judgment of Stock Building Supply, LLC and PLF of Sanford, Inc.* (Docket Entry 768 at 30-31).

[9] Excerpts from the transcripts of Steve Tidey's and Kevin Lloyd's depositions can be found in the appendix to the *Memorandum in Support of Third-Party Defendant Waterproofing Specialties, Inc.'s Motion for Summary Judgment*, Docket Entry 713-1 at 46-48 (Kevin Lloyd), and 67-69 (Steve Tidey).

Furthermore, there is evidence that as early as 2008, Weaver Cooke was aware of Stock Supply's failure to install sill pan flashing, yet Weaver Cooke did nothing to remedy the problem. Tidey testified that he knew that pan flashing was not installed underneath the sliding glass doors by at least December 31, 2008.  Tidey further testified that he did not take any steps to address the lack of sill pans, nor was he aware of anyone else within Weaver Cooke taking responsive or remedial action.  Weaver Cooke's president, Dan Estes, confirmed that based on the "punch-out process" for the SkySail Project, Tidey should have identified this problem by September of 2008.[10]

The above discussion was set out in the Stock Supply order and focuses on the subcontractors involved in the balcony doors and windows, but is significant with regard to HRCI in that Weaver Cooke alleges that defects in HRCI's work caused water intrusion and related damages to other parts of the Project, separate and apart from the actual scope of HRCI's work on the roof, including damage to flooring in condo units.  Weaver Cooke does not, and cannot, assert that HRCI is solely responsible for damages caused by the water intrusion, and based on the multiple defects identified by Weaver Cooke, which resulted from several different subcontractors' work, the court has no basis upon which to even try to imagine a scenario where HRCI's work could possibly be the sole cause of the damages about which Weaver Cooke now complains.

In sum, it is apparent that regardless of the *extent* to which the work done by other subcontractors played a causative role in the water intrusion problems at SkySail, *and regardless of the extent of Weaver Cooke's own role and fault, if any, in relation to the water intrusion problem*,

---

[10]  Relevant excerpts from the transcripts of Tidey's and Dan Estes' depositions can be found in *Stock Building Supply LLC's and PLF of Sanford, Inc.'s Memorandum in Support of their Motion for Summary Judgment against Weaver Cooke Construction, LLC.*, Docket Entry 721 at 147-48 (Dan Estes) and 154 (Tidey).

19

Weaver Cooke can neither argue nor establish that HRCI is *wholly* responsible for the resulting damages. This is due to the narrow scope of Weaver Cooke's indemnity provision, as blue-penciled by the court[11] (which was, as discussed above, necessitated by Weaver Cooke's own election to include in its contracts language that is in express violation of the statute intended to govern precisely these situations). No genuine issue of material fact exists as to whether HRCI is *solely* responsible for the damages for which Weaver Cooke asserts it is liable, and summary judgment on the indemnity claim, to the extent it is based on ¶ 16.2, is appropriate.

### B.    Paragraph 16.1

While ¶ 16.2 is by far the more overtly substantive and specific of the provisions upon which Weaver Cooke bases its indemnity claim, in its response to Stock Supply's motion for summary judgment, Weaver Cooke also pointed to ¶ 16.1 of the Subcontract, which provides in its entirety: "Subcontractor shall be responsible to Contractor for the acts and omissions of Subcontractor's employees, sub-subcontractors and their agents and employees, and other persons performing portions of Subcontractor's Work under a contract with Subcontractor." See HRCI Mem. Ex. 1 at 9 ¶ 16.1. Weaver Cooke's argument in response to HRCI's motion for summary judgment is precisely the same as the argument it made in connection with Stock Supply's motion for summary

---

[11] The court concludes that there is no necessary and appropriate basis upon which it should decline to follow or endeavor to further distinguish Vecellio because, as illustrated above, even when this court toes the Vecellio line, a blue-penciled version of the indemnity language does not help Weaver Cooke. The court cannot *add* language to a blue-penciled contractual provision (which should be especially true in the indemnity context, where language is strictly construed against the party seeking indemnification), so there is no basis upon which ¶ 16.2 can require HRCI's indemnification of Weaver Cooke. See Jackson v. Associated Scaffolders & Equip. Co., Inc., 568 S.E.2d 666 (N. C. App. 2002) (indemnity provision void, where to make it enforceable the court "would be required to add language, rather than simply excise portions of the agreements which violate the statute").

judgment, and in the interest of thoroughness, the court recites below the analysis it set out in its earlier order:

According to Weaver Cooke, this provision is "not limited to personal injury or property damage caused by Stock's and PLF's negligence, as it [sic] is ¶ 16.2." Weaver Cooke Mem. at 46. What exactly that damage could be, if not the property damage at issue in the case and already discussed in connection with ¶ 16.2, is unclear to the court.

Weaver Cooke attempts to turn that uncertainty to its advantage by urging the court to apply the "fundamental rule of contract construction that the courts construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so," and on that basis to conclude that ¶ 16.1 of the Subcontract provides a "separate and distinct indemnity obligation," notwithstanding the fact that the provision does not even mention indemnity. Weaver Cooke Mem. at 46-47 (quoting Johnston Co. v. R.N. Rouse & Co., 414 S.E.2d 30, 34 (N.C. 1992)). Specifically, Weaver Cooke contends the paragraph "shows an express intent to provide for indemnity which is much broader than that provided in ¶ 16.2." Id. at 48.

The court cannot "reasonably" extend the reach of this language in the way Weaver Cooke requests. See Johnston, 414 S.E.2d at 34; see also City of Wilmington, 450 S.E.2d at 575-76 (courts construe indemnity clause against the party asserting it). Most obviously, a party acknowledging that it is "responsible to" another party is, under no stretch of that language or this court's imagination, sufficient in and of itself to *require indemnification*, and that is precisely what Weaver Cooke asserts when it argues that ¶ 16.1, *standing alone*, requires that Stock Supply indemnify it for all damages caused wholly or in part by Stock Supply, other than the property damages contemplated by ¶ 16.2.[12]

Indeed, it appears to the court that ¶ 16.1 is associated with the topic of "indemnity" only by virtue of its location – under the "Indemnity" topic heading, and preceding ¶ 16.2 See Stock Supply Mem. Ex. A (Subcontract) at 12 ¶ 23.1 ("The headings in this Subcontract are for reference only and shall not affect the interpretation of this Subcontract."). Moreover, the words "responsible to" are used elsewhere in the Subcontract to denote something different from and less than an indemnity obligation. For example, the attachments to the Subcontract setting out the scope of work Stock Supply will provide together with the architectural drawings and specifications Stock Supply is required to follow include the following footer: "Subcontractor is responsible for all cleanup associated with his phase of work."

_____

[12] Again, Weaver Cooke has not presented its position as to what those damages are, other than to posit that they are different from those contemplated by ¶ 16.2.

Stock Supply Mem. Ex. A, Subcontract, Attachments A-1, B-1.  In addition, ¶ 8.8 of
the Subcontract provides that  be responsible for the care and
protection of Subcontractor's Work and materials until final acceptance by the
Architect and/or Owner," and then goes on to illustrate the scope of that
responsibility by addressing who pays for what if "the work" incurs damage and
needs repair.  Id., Ex. A. at 4 ¶ 8.8 ("Protection of Work").[13]

While this generalized language is consistent with Stock Supply's contractual
obligation to indemnify Weaver Cooke as is more specifically set out in ¶ 16.2 (and
¶ 16.3, which is not at issue), ¶ 16.1 does not, in and of itself, require something more
or different from Stock Supply.  The court concludes that neither of these provisions,
whether construed individually or in tandem, can require Stock Supply to indemnify
Weaver Cooke for anything other than, at most, damages to property caused "wholly"
by Stock Supply.  As discussed above, that argument is not available to Weaver
Cooke, and summary judgment on Weaver Cooke's assertion of an indemnity claim
arising out of ¶ 16.1 is appropriate.

## II.    Effect of Contributory Negligence on Indemnity Claim

In light of the court having determined that HRCI's contractual obligation to indemnify

Weaver Cooke can encompass only those damages to property for which HRCI is "wholly"

responsible, the question becomes whether Weaver Cooke – or, indeed, any other party or parties

– contributed to the damages for which Weaver Cooke seeks indemnification.  In HRCI's view, and

as was persuasively argued by Stock Supply, "Weaver Cooke's negligent construction of the Project,

its negligent supervision of the Project, and its negligent instructions to the subcontractors are the

primary cause of, or at least a contributing cause of, the alleged construction defects at Skysail about

which Weaver  Cooke complains in its Third-Party Complaint."  Stock Supply Mem. at 39-40.

Thus, Weaver Cooke's contributory negligence "bars any indemnity under § 22B-1, whether

grounded in negligence, contract, or otherwise." Id. at 40.  In response, Weaver Cooke argues that

its indemnity claim sounds in contract, while contributory negligence is a defense that sounds in tort.

_____

[13] Identical language is featured in HRCI's Subcontract at attachments A, A-1, A-2, and
B.

It was not necessary to enter a separate order addressing contributory negligence as to Stock Supply, but the court will do so as to HRCI.   In this indemnity context, however, the relevant inquiry is whether Weaver Cooke, as the party *seeking indemnity under a contract*, is attempting to hold HRCI liable for damages *attributable to others*, including Weaver Cooke itself.   As discussed above, ¶ 16.2 of the Subcontract cannot pass statutory muster unless this court intervenes, under Vecellio, by excising the language offensive to public policy and the statute.   What Weaver Cooke is left with are contractual provisions that would, at most, require HRCI to indemnify Weaver Cooke for damages caused "wholly" by HRCI.   As was also discussed above, Weaver Cooke does not argue (and cannot, based upon the evidence already before the court) that the actions of HRCI, or parties for which it is responsible under the Subcontract, were the sole cause of the damages at issue. Thus, the contributory negligence of *any* party – including, obviously, Weaver Cooke – is acutely relevant to construction of the Subcontract.   To reiterate: "[I]if any other party failed to act reasonably prudent under the circumstances, and that negligence contributed to [Weaver Cooke's] loss, the indemnification provision does not apply."   Associated Mech. Contrs., 178 F.3d 1282, 1999 WL 253539 at *5  (4th Cir. 1999) (unpublished disposition) (citing § 22B-1).

The court has already discussed, at length, the nature, extent and significance of Weaver Cooke's own allegations with respect to the multiple causative factors and sources of the water intrusion problems at SkySail.   For those reasons, and on this alternative ground, summary judgment on the indemnity claim is appropriate.

**III.    Right to Indemnification pursuant to Indemnity Implied-in-fact.**

Finally, in its response to both Stock Supply's motion and the motion filed by HRCI, Weaver Cooke also asserted that its right to indemnity is based *not only* on the contractual indemnity theory

already discussed, which "arises from [¶¶] 16.1 and 16.2 of the parties' subcontract and thus is based

on an express contract," but also on an *implied-in-fact* indemnity claim, which is a creature of state

law.  Weaver Cooke Mem., Docket Entry 768, at 37, 42-53.  Again, given that Weaver Cooke's

argument in Stock Supply is identical to its argument with respect to HRCI, and  because the court's

reasoning is equally applicable here, the court recites its analysis from the earlier opinion:

> "A right of indemnity implied-in-fact stems from the existence of a binding contract
> between two parties that necessarily implies the right.  The implication is derived
> from the relationship between the parties, circumstances of the parties' conduct, and
> that the creation of the indemnitor/indemnitee relationship is derivative of the
> contracting parties' intended agreement."  Weaver Cooke Mem. at 50-51, quoting
> Kaleel Builders, Inc. v. Ashby, 587 S.E.2d 470, 474 (N.C. App. 2003), disc. rev.
> denied, 595 S.E.2d 152 (N.C. 2004).

> According to Weaver Cooke, the court should take into account the various
> responsibilities [defendant] undertook throughout the Subcontract, its warranties that
> its work would be free of defects, and its expressed intent to be "responsible for [the
> defendant's] own acts and omissions and those of its sub-subcontractors," which in
> Weaver Cooke's view basically coalesce in such a way as to at least implicitly
> require indemnification.  Weaver Cooke Mem., Docket Entry 768, at 52-53.

> In response, [defendant] argues that this theory amounts to the assertion of a
> new claim:  one that is absent from Weaver Cooke's pleadings, and therefore
> precluded as untimely.  Also absent from Weaver Cooke's Third-Party Complaint is
> any assertion of a key component of such a claim, which Weaver Cooke would have
> been required to plead along with it: specifically, to assert a claim for contractual
> indemnity implied-in-fact, the proponent must establish that there is a "special
> relationship" between the parties, from which the implication, and the claim, arise.
>  And, as [defendant] argues persuasively in its brief, the cases cited by Weaver Cooke
> and those located by [defendant] include no examples of courts finding that
> contractual indemnity implied-in-fact existed in factual scenarios that align with the
> instant case; *i.e.*, where the parties' written contract already includes an indemnity
> provision.  Stock Supply Mem. at pp. 21-22 (citing cases).

> For the reasons that follow, the court agrees with [defendant] with respect to
> all of those arguments; first, a claim for indemnity implied-in-fact is a separate claim
> that must be set out in the complaint, which Weaver Cooke did not do and cannot do
> now.  Further, even if Weaver Cooke had successfully included at least some
> components of such a claim in its Second Third-Party Complaint, it failed to allege

the "special circumstances" necessary to provide a factual basis from which such an agreement could be implied. As the North Carolina Court of Appeals recently explained:

> A right of indemnity implied in fact stems from the existence of a binding contract between two parties that necessarily implies the right. The implication is derived from the relationship between the parties, circumstances of the parties' conduct, and that the creation of the indemnitor/indemnitee relationship is derivative of the contracting parties' intended agreement. [citations omitted] In order to establish such a right to indemnity, *this Court has required a plaintiff to show special circumstances from which such an agreement might be implied*. See, e.g., McDonald, 91 N.C. App. 13, 370 S.E.2d 680 (holding that a defendant had submitted sufficient evidence to establish the existence of an implied-in-fact contract for indemnity with respect to attorney's fees where another defendant had orally agreed to provide him with an attorney in the event he was sued by plaintiff for breach of contract).

Carl v. State of North Carolina, 665 S.E.2d 787, 798 (N.C. App. 2008) (emphasis added), cert denied, 672 S.E.2d 684 (N.C. 2009).

And, in this proceeding, Weaver Cooke did not cite to any authority (nor was the court able to locate any) where a court recognized a party's right to assert a claim for indemnity implied-in-fact in a factual context similar to that in the instant case – where the parties' contract already expressly provides for indemnity. In this context, the court is hard pressed to think of an appropriate basis upon which one would be implied, because it seems that the two could not comfortably co-exist. In short, indemnity implied-in-fact is not a backup plan, to which a contractor may resort when flawed contractual provisions overreach and are then curbed. This rationale is consistent with the court of appeals' holding in Schenkel & Shultz, Inc. v. Hermon F. Fox & Associates, P.C., 636 S.E.2d 835 (N.C. App. 2006), aff'd, 658 S.E.2d 918 (N.C. 2008), wherein the court explained that "in the context of independent contractor relationships," which is what exists between Weaver Cooke and [defendant],

> *a right of indemnity under a contract implied-in-fact is inappropriate where, as here, both parties are well equipped to negotiate and bargain for such provisions*. [citation omitted] Accordingly, in light of the ability and capacity of parties to construction contracts to negotiate and bargain for mutually agreeable terms, we decline to read a right of indemnity implied-in-fact into the independent contractor agreement in this case. As previously stated by this Court,

to do otherwise "would be to do so in every general and subcontractor agreement, thus infringing upon this state's long standing and coveted principle of freedom of contract.'

636 S.E.2d at 842-43, quoting Kaleel, 587 S.E.2d at 475.

The court concludes that Weaver Cooke did not timely assert a claim for contractual indemnity implied-in-fact; that even if to some limited extent it had done so, it still failed to allege the necessary "special circumstances" required to support such a claim; and finally, that undisputed material facts of record (*i.e.* the existence of an existing indemnity provision) would, under controlling case law, preclude such a claim in this case, such that [defendant] would have been entitled to summary judgment on this ground as well.

Order of August 22, 2014, Docket Entry 898.

## CONCLUSION

For the foregoing reasons, HRCI's motion for summary judgment with respect to Weaver Cooke's claim against it, for indemnity, is **ALLOWED**.

**SO ORDERED.**

### END OF DOCUMENT