**SO ORDERED.**

**SIGNED this 29 day of September, 2017.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

**IN RE:**

| | |
|---|---|
| **NEW BERN RIVERFRONT DEVELOPMENT, LLC,** | **CASE NO. 09-10340-8-SWH** |
|     **DEBTOR** | |

| | |
|---|---|
| **NEW BERN RIVERFRONT DEVELOPMENT, LLC,** | **ADVERSARY PROCEEDING NO. 10-00023-AP** |
|     **Plaintiff,** | |
|       **v.** | |
| **WEAVER COOKE CONSTRUCTION, LLC; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA; J. DAVIS ARCHITECTS, PLLC; FLUHRER REED PA; and NATIONAL ERECTORS REBAR, INC. f/k/a NATIONAL REINFORCING SYSTEMS, INC.,** | **ORDER ON REMAND REGARDING STOCK BUILDING SUPPLY MOTION FOR SUMMARY JUDGMENT ON INDEMNITY CLAIM AND ALLOWING MOTION TO EXCLUDE EXPERT REPORT** |
|     **Defendants,** | |
|     **and** | |
| **WEAVER COOKE CONSTRUCTION, LLC; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,** | |
|     **Defendants, Counterclaimants, Crossclaimants and Third-Party Plaintiffs,** | |
|       **v.** | |

**J. DAVIS ARCHITECTS, PLLC, FLUHRER
REED PA, SKYSAIL OWNERS ASSOCIATION,
INC.; NATIONAL REINFORCING SYSTEMS,
INC., ROBERT P. ARMSTRONG, JR., ROBERT
ARMSTRONG, JR., INC., SUMMIT DESIGN
GROUP, INC., CAROLINA CUSTOM
MOULDING, INC., CURRENTON CONCRETE
WORKS, INC., WILLIAM H. DAIL d/b/a
DD COMPANY, EAST CAROLINA MASONRY,
INC., GOURAS, INC., HAMLIN  ROOFING
SERVICES, INC., HUMPHREY
HEATING & AIR CONDITIONING, INC.;
PERFORMANCE FIRE PROTECTION, LLC;
RANDOLPH STAIR AND RAIL COMPANY;
STOCK BUILDING SUPPLY, LLC; PLF OF
SANFORD, INC. f/d/b/a LEE WINDOW &
DOOR COMPANY; UNITED FORMING,
INC. a/d/b/a UNITED CONCRETE, INC.;
JOHNSON'S MODERN ELECTRIC
COMPANY, INC.; and WATERPROOFING
SPECIALITIES, INC.,**
      **Crossclaimants, Counterclaimants and
      Third-Party Defendants.**


      **and**

**NATIONAL ERECTORS REBAR, INC.**
      **Defendant, Counterclaimant,
      Crossclaimant and Third-Party
      Plaintiff,**

      **v.**

**ROBERT P. ARMSTRONG, JR., ROBERT
ARMSTRONG, JR., INC., SUMMIT DESIGN
GROUP, INC., JMW CONCRETE
CONTRACTORS, and JOHNSON'S MODERN
ELECTRIC COMPANY, INC.**
      **Third-Party Defendants.**

      **and**

**J. DAVIS ARCHITECTS, PLLC,**

2

**Third-Party Plaintiff,**

**v.**

**MCKIM & CREED, P.A.,**
          **Third-Party Defendant.**

          **and**

**GOURAS, INC.,**
          **Third-Party Defendant and**
          **Fourth-Party Plaintiff,**

          **v.**

**RAFAEL HERNANDEZ, JR., CARLOS**
**CHAVEZ d/b/a CHAVEZ DRYWALL,**
**5 BOYS, INC. and ALEX GARCIA**
**d/b/a/ JC 5,**
          **Fourth-Party Defendants.**

          **and**

**STOCK BUILDING SUPPLY, LLC,**
          **Third-Party Defendant and**
          **Fourth-Party Plaintiff,**

          **v.**

**CARLOS O. GARCIA, d/b/a/ C.N.N.C.,**
          **Fourth-Party Defendant.**


### ORDER ON REMAND REGARDING STOCK BUILDING SUPPLY
### MOTION FOR SUMMARY JUDGMENT ON INDEMNITY CLAIM
### AND ALLOWING MOTION TO EXCLUDE EXPERT REPORT

The matter before the court is the district court's remand after appeal of this court's order

allowing summary judgment for third-party defendants Stock Building Supply, LLC and PLF of

Sanford, Inc. (formerly dba Lee Window & Door Co.) (herein collectively "Stock Supply") against

third-party plaintiff Weaver Cooke Construction, LLC ("Weaver Cooke").  The court also will rule

3

on Stock Supply's pending motion to exclude the reports and testimony of plaintiff's expert George Barbour insofar as the reports and testimony relate to windows and doors in the SkySail Luxury Condominiums ("SkySail" or "the Project"). For the reasons outlined below, the court will allow Stock Supply's motion to exclude the testimony of Mr. Barbour and will again, on remand, allow summary judgment for Stock Supply on the indemnity claim.

### DISCUSSION

New Bern Riverfront Development, LLC ("New Bern") is the owner and developer of SkySail Luxury Condominiums in New Bern, North Carolina. Weaver Cooke served as the SkySail Project's general contractor, and Stock Supply as the subcontractor who supplied and installed the windows and doors. New Bern filed a state court action against Weaver Cooke and others in March 2009, and filed a petition for relief under Chapter 11 of the Bankruptcy Code in November 2009. The state court action was removed to the United States District Court for the Eastern District of North Carolina, and subsequently transferred to this court.

With leave of court, Weaver Cooke filed its second third-party complaint on June 14, 2012, asserting claims of negligence, contractual indemnity, and breach of express warranty against many of the subcontractors hired during the construction of the SkySail Project, including Stock Supply. On December 20, 2013, Stock Supply filed a motion for summary judgment regarding all three causes of action alleged against it by Weaver Cooke.[1] On that same date, Stock Supply also filed a motion to exclude the report and testimony of George Barbour, insofar as the report and testimony

---

[1]As grounds for the motion, Stock Supply argued that (1) the applicable statute of limitations barred Weaver Cooke's claims of negligence and breach of express warranty; (2) the economic loss rule barred Weaver Cooke's negligence claim; and (3) N.C. Gen. Stat. § 22B-1 barred Weaver Cooke's contractual indemnity claim.

pertains to Stock Supply.  (D.E. 722, the "Motion to Exclude")  Mr. Barbour is New Bern's expert witness, and his report and testimony are relied upon by Weaver Cooke in support of its case. The court granted summary judgment in favor of Stock Supply on the negligence and breach of express warranty claims in an order entered June 10, 2014.

On August 22, 2014, the court entered an order granting summary judgment in favor of Stock Supply on the indemnity claim, which was Weaver Cooke's only remaining claim against Stock Supply.  (D.E. 898, the "Indemnity Order")  In subsequent orders, the court entered summary judgment for other third-party defendants (collectively, the "Related Orders") on essentially the same bases as those cited in the Indemnity Order.  For purposes of appeal, the Indemnity Order and the Related Orders were certified as final by both this court and the district court.  In an order entered on August 12, 2016, the district court affirmed the Indemnity Order in part, reversed in part, and remanded for further proceedings. (D.E. 1326, the "Order on Appeal")  The district court decided the appeals of the Related Orders on a similar basis.[2]  On September 23, 2016, Stock Supply

_____

[2]In addition to the Stock Supply Order on Appeal (D.E. 1326), the other "Related Orders" on the indemnity issue which respect to which the district court affirmed in part, reversed in part, and remanded, are: *Weaver Cooke Constr. LLC  v. Curenton Concrete Works, Inc.*, Order (E.D.N.C. Aug.15, 2016) (D.E. 1327); *Weaver Cooke Constr. LLC v. East Carolina Masonry, Inc.*, Order (E.D.N.C. Aug.15, 2016) (D.E. 1328); *Weaver Cooke Constr. LLC v. Gouras, Inc.*, Order (E.D.N.C. Aug.15, 2017)  (D.E. 1329); *Weaver Cooke Constr. LLC v. Randolph Stair and Rail Co.*, Order (E.D.N.C. Aug.15, 2016) (D.E. 1330); *Weaver Cooke Constr. LLC v. Waterproofing Specialties, Inc.*, Order (E.D.N.C. Aug.15, 2016) (D.E. 1331) and *Waterproofing Specialties, Inc. v. Weaver Cooke Constr., LLC*, Order (E.D.N.C. Jan. 4, 2017) (D.E. 1359); *Weaver Cooke Constr. LLC v. Humphrey Heating and Air Conditioning, Inc.*, Order (E.D.N.C. Aug. 23, 2016) (D.E. 1332); and *Weaver Cooke Constr. LLC v. Hamlin Roofing Services, Inc.*, Order (E.D.N.C. Mar. 24, 2017) (D.E. 1384) .

In the Related Orders, the district court cited the Stock Supply Order on Appeal and noted that in it, "the identical indemnification provisions were at issue, and this court held, among other things, neither N.C. Gen. Stat. § 22B-1 nor the contributing negligence of other parties precluded Weaver Cooke's indemnification claim against the subcontractor." *See, e.g., Weaver Cooke Constr. LLC v. Curenton Concrete Works, Inc.*, Order at 1 fn.1 (D.E. 1327).

filed a motion for reconsideration and clarification, which the district court denied.

On May 16, 2017, this court held a status conference to consider the parameters of the matter on remand.  The parties collectively agreed that in a subsequent hearing counsel for Stock Supply and Weaver Cooke would take the lead in presenting the primary arguments pertaining to the indemnity issue, after which the court would enter an order resolving the matter on remand as between Weaver Cooke and Stock Supply.  After that, the parties to the Related Orders would have an opportunity to submit briefs addressing the extent to which that order does, or does not, resolve the matter on remand as to them.  Weaver Cooke and Stock Supply presented their arguments in a hearing held on July 19, 2017, together with arguments on the closely related matter of Stock Supply's motion to exclude the testimony and expert report of Mr. Barbour.  Post-hearing, both Stock Supply and Weaver Cooke provided the court with supplemental citations of authority, and the matter is ripe for disposition.

## DISCUSSION

The primary issue addressed in the Indemnity Order, and discussed by the district court in the Order on Appeal, was whether contractual indemnification language in ¶ 16.2 of Article 16 of Weaver Cooke's subcontract (as assigned to and performed by Stock Supply) ran afoul of North Carolina General Statute § 22B-1.  In pertinent part, the subcontract provides as follows:

> 16.2  To the fullest extent permitted by law, Subcontractor shall indemnify and hold harmless Contractor, its agents and employees from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from Subcontractor's performance of Subcontractor's Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than

6

Subcontractor's Work itself) including loss of use resulting therefrom, if caused in whole or in part by the negligent acts or omissions of Subcontractor, a sub-subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, *regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.* Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity, which would otherwise exist as to a party or person described in this Article.

Stock Supply Mem. Ex. A (Weaver Cooke Subcontract) at 9 ¶ 16.2 (emphasis added) (D.E. 721).

The North Carolina statute provides:

Any promise or agreement in, or in connection with, a contract or agreement relative to the design, planning, construction, alteration, repair or maintenance of a building, structure, highway, road, appurtenance, or appliance, including moving, demolition and excavation connected therewith, *purporting to indemnify and hold harmless the promisee*, the promisee's independent contractors, agents, employees, or indemnitees against liability for damages arising out of bodily injury to persons or *damage to property proximately caused by or resulting from the negligence, in whole or in part, of the promisee*, its independent contractors, agents, employees, or indemnitees, is against public policy and is void and unenforceable. Nothing contained in this section shall prevent or prohibit a contract, promise or agreement whereby a promisor shall indemnify or hold harmless any promisee or the promisee's independent contractors, agents, employees or indemnitees against liability for damages resulting from the sole negligence of the promisor, its agents or employees.

N.C. Gen. Stat. § 22B-1 (emphasis added).

In the Indemnity Order, this court held that the "regardless of" clause violated the statute, which invalidates contractual indemnity provisions that purport to require a subcontractor to indemnify a general contractor for its own negligence. Indemnity Order at 9, citing *St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co.*, 187 F. Supp. 2d 584, 590 n.7 (E.D.N.C. 2000) ("Under North Carolina law, a general contractor cannot require a subcontractor to insure it against its own negligent acts."). In addition, this court held that in this context, the "or in part" clause also violated the statute, reasoning that the provision as written

requires Stock Supply to indemnify Weaver Cooke for damages caused "in part" by

> Stock Supply's negligence, *leaving open the question whether such damages may also be caused in part by Weaver Cooke itself*. Because courts strictly construe an indemnity provision against the party asserting it, language that "might require defendant to indemnify plaintiff from plaintiff's own negligence" is deemed void. *City of Wilmington v. N.C. Natural Gas Corp.*, 117 N.C. App. 244, 248, 450 S.E.2d 573, 576 (1994).

Indemnity Order at 9 (emphasis added).

On appeal, the district court accepted this court's strike-through of the "regardless of" clause, but disagreed with its excision of the "or in part" clause. Specifically, the district court held that it would

> assume[ ] without deciding that the bankruptcy court properly concluded that the last clause of ¶ 16.2 quoted above, i.e. the "regardless of" clause, violates § 22B-1 and should be severed. *See Int'l Paper*, 385 S.E.2d at 555 (holding that the clause "regardless of whether or not it is caused in part by a party indemnified hereunder" in a similar indemnity provision "violates the provisions of G.S. § 22B-1" and severing that portion). The court, however, disagrees with the bankruptcy court's conclusion that the phrase limiting indemnification to claims, damages, losses, and expenses caused *in part* by the negligent acts [or] omissions [of] the subcontractor likewise violates § 22B-1. The statute does not preclude indemnification when one is being held responsible solely for one's own negligence even though other parties might have been negligent too. *See* N.C. Gen. Stat. § 22B-1 ("Nothing contained in this section shall prevent or prohibit a contract, promise or agreement whereby a promisor shall indemnify or hold harmless any promisee or the promisee's independent contractors, agents, employees or indemnitees against liability for damages resulting from the *sole* negligence of the promisor, its agents or employees." (emphasis added)). When one reads the whole of ¶ 16.2 (with the last clause redacted), Stock agreed to indemnify Weaver Cooke only for damages arising out of Stock's performance of its work and caused by Stock's (or its agents['])  negligence. The provision does not purport to hold Stock responsible for the negligence of any other party and thus comports with § 22B-1 and does not bar indemnification if other parties were negligent.

Order on Appeal at 6. In addition, the district court agreed with Weaver Cooke's challenge "to the bankruptcy court's conclusion to award summary judgment to Stock on Weaver Cooke's indemnification claim on the alternative ground of contributory negligence." *Id.* at 7. Applying the same rationale as before, the district court held that this court erred in "conclud[ing] Weaver

Cooke could not seek indemnification from Stock as Stock did not 'wholly' cause the damages at issue," and held that neither the statute nor the subcontract "prohibits indemnification where *parties in addition to the promisee/subcontractor* are negligent." *Id.* (emphasis added).

Ultimately, the district court reversed the Indemnity Order on grounds that "the provision in this case permits Weaver Cooke to recover in indemnification for damages arising out of Stock's performance of its work and caused by Stock's (or its agents['])  negligence, irrespective of whether other parties were negligent too and contributed to the damages." *Id.* at 8. The district court remanded the Indemnity Order for further proceedings in accordance with its order. Finally, the district court also noted, in concluding, that

> Stock raises an alternative argument in support of affirming the bankruptcy court, that is, Stock did not engage in conduct that proximately caused property damage to the project. Although Stock raised this argument in support of its motion for summary judgment, the bankruptcy court did not address it. The court leaves it to the bankruptcy court to consider it, if necessary, in the first instance on remand.

*Id.* at 8 n.4 (citation omitted).

At the July 19 hearing, the court determined that it would be necessary to consider the proximate cause argument along with the indemnity issue. Stock Supply reiterated its position that Weaver Cooke has not and cannot provide admissible, relevant evidence sufficient to establish that there are genuine issues of material fact as to whether Stock Supply's products, or its installation of them, proximately caused Weaver Cooke's damages. This proximate cause argument also relates to the remanded indemnity issue because § 22B-1 is a negligence-based statute, such that traditional negligence analyses apply. In the discussion below, the court will address Stock Supply's proximate cause argument first, and will conclude that under *Daubert* and Rule 702 of the Federal Rules of Evidence, the Barbour Report must be excluded as to Stock Supply. The court will allow summary

judgment for Stock Supply on grounds that there is a lack of evidence of proximate cause. Further, the court will allow summary judgment for Stock Supply on the additional, alternative ground that Weaver Cooke's contributory negligence *vis-a-vis Stock Supply* precludes it from obtaining indemnification from Stock Supply under ¶ 16.2 of the parties' subcontract.

## I.     Proximate Cause

In order to invoke the indemnification clause in the Weaver Cooke-Stock Supply subcontract, Weaver Cooke must prove that Stock Supply was negligent. Proximate cause is an essential element of negligence, and Stock Supply has consistently argued that there is no evidence that its conduct or products proximately caused the damages sought by Weaver Cooke. At the July 2017 hearing, Stock Supply argued persuasively that the most logical approach to this matter on remand was to first look at the threshold issue of whether Weaver Cooke can satisfy its burden of showing that genuine issues of material fact exist as to whether Stock Supply's products, or its installation of them, proximately caused water intrusion damages at SkySail. Whether Weaver Cooke can do so turns on the court's disposition of Stock Supply's Motion to Exclude, which was fully briefed by the parties and remains pending before the court.[3] In it, Stock Supply seeks to exclude the testimony, opinions and report of George Barbour, New Bern's[4] primary expert witness in this proceeding. Stock Supply contends, and Weaver Cooke acknowledges, that Mr. Barbour's report ("Barbour Report"), the relevant portion of which is set forth in "Exhibit K," is the *only* source of evidence upon which Weaver Cooke relies to establish that Stock Supply's products and/or

---

[3]As is discussed later, however, the court determines that even if the Barbour Report *were* admitted, it would be insufficient to establish genuine issues of material fact as to causation.

[4]In the July 2017 hearing, counsel for New Bern presented the arguments in opposition to the motion to exclude rather than Weaver Cooke.

its installation of them proximately caused the water intrusion damages at SkySail.  *See Stock Supply's* Mem. of Law in Supp. of Motion to Exclude at 1-2 & Ex. K (D.E. 723).

By way of refresher, the damages that Weaver Cooke attributes to Stock Supply (and as to which it seeks indemnity from Stock Supply) relate to alleged defects that resulted in water intrusion in or around the Project's exterior doors and windows and caused damage to the interior of certain condo units and certain structural components of the Project.[5]  Weaver Cooke asserted identical claims of negligence, breach of warranty and indemnification against multiple subcontractors, all related to what it cites as each subcontractor's contribution to the water intrusion problem.  With respect to water damage through windows and doors, these included the pooling of water on balconies due to improper balcony slopes and inadequate "step-downs" between the balcony doors and the concrete balcony floors, as installed by subcontractor Curenton Concrete Works, Inc. ("Curenton"); the failure of Tyvek (a weather resistant material manufactured by DuPont that is used in the construction industry as a building wrap) to be properly sealed and integrated with the installation of the exterior doors and windows by subcontractor Gouras Incorporated ("Gouras"); and the sequence in which the waterproof traffic coating was applied by subcontractor Waterproofing Specialties, Inc. to the concrete balconies in relation to the installation of the exterior balcony doors.  As to Stock Supply, Weaver Cooke alleged that Stock Supply's failure to install sill

---

[5] Weaver Cooke did not, in any of its pleadings, identify the specific defects for which it sought to hold Stock Supply liable and that served as the bases for its negligence, breach of warranty, and indemnification claims.  Stock Supply, in its memorandum of law supporting its motion for summary judgment (D.E. 721), identified water intrusion through the Project's exterior doors and windows, and its resulting damage, as conditions for which Weaver Cooke sought to hold it responsible.  In responding to Stock Supply's motion for summary judgment (D.E. 768), Weaver Cooke acknowledged that it sought to hold Stock Supply responsible for these damages related to water intrusion, and cited the Barbour Report to further identify the specific defects that it attributed to Stock Supply.

pan flashing beneath the balcony sliding glass doors contributed to water intrusion and caused damage to the interior of certain condo units and certain structural components of the Project. Weaver Cooke acknowledged that Stock Supply's alleged failure to install sill pan flashing is attributable to the work of another subcontractor. "The doors were installed without a sill pan because the balconies were at the same level as where the pans would need to be installed." Weaver Cooke's Memorandum in Response to Motion for Summary Judgment of Stock Building Supply, LLC and PLF of Sanford, Inc., at 8 (D.E. 768) (citing Attachment 1 (Ex. 2 Deposition of Stock) at 73, line 20 through 74, line 10). In other words, achieving the necessary step-down was a prerequisite to the installation of sill pans.

As the court discussed in the Indemnity Order, there is evidence in the record that Weaver Cooke itself contributed to the water intrusion problem. Certain management-level employees for Weaver Cooke admit that Weaver Cooke contributed to the sequencing error wherein the sliding glass doors were installed before the traffic coating had been applied to the concrete balconies. Steve Tidey, Weaver Cooke's project superintendent, admitted that Weaver Cooke created a construction schedule that called for the application of the traffic coating *after* the installation of the sliding glass doors. Tidey further acknowledged that this was a mistake on the part of Weaver Cooke. Kevin Lloyd, Weaver Cooke's project manager and vice president, confirmed that Weaver Cooke's schedule called for the doors to be installed before the application of the traffic coating to the balconies. Lloyd further testified that this scheduling component was an obvious error when compared to the architectural details, which called for the application of the traffic coating prior to

the installation of the exterior doors.[6]

During the July 2017 hearing, the proximate cause inquiry focused on whether there was admissible, relevant evidence in the record sufficient to establish causation.  Stock Supply argued in its Motion to Exclude that under *Daubert* and Rule 702 of the Federal Rules of Evidence,  Exhibit K should be not be admitted for multiple reasons: "Barbour's opinions are not relevant, and indeed would be misleading, to the trier of fact because he did not perform any forensic testing of or destructive testing on the windows or exterior doors at Skysail to determine the cause of source of the water intrusion he observed (i.e., whether windows or doors were the proximate cause of water penetration)."  Motion to Exclude at 1 (D.E. 723).

Stock Supply argued further that "[a]bsent forensic testing to show the source of any water intrusion, Barbour cannot credibly testify as to the *cause* of any water infiltrating around the windows and doors at Skysail."  Mem. in Support of Mot. to Exclude at 18 (emphasis added).  More specifically,

> Barbour did not physically examine (i.e., forensic or destructive testing) the windows and doors at Skysail to determine the source of the alleged water intrusion.  As discussed [elsewhere in Stock Supply's memorandum of law], AAMA requires that "[i]f field testing of fenestration products is required after the building occupancy permit has been issued or *more than six months* after product installation, AAMA 511 *shall* be used."  AAMA 502-08, § 1.1 (emphasis added).  As the accepted methodology for forensic water testing, the objective of AAMA 511 "is to identify the leak path(s) through simulation of the weather events that produced the reported penetration."  AAMA 511, § 4.2.1.1.  Rather than utilize the forensic testing specifications set forth in AAMA 511, Barbour deliberately chose to ignore them:
>
> Q.      I've got a copy of AAMA 511, but you have clearly testified that you never

_____

[6]Excerpts from the transcripts of Steve Tidey's and Kevin Lloyd's depositions can be found in the attachment to the Memorandum in Support of Third-Party Defendant Waterproofing Specialties, Inc.'s Motion for Summary Judgment at 46-48 (Kevin Lloyd), and 67-69 (Steve Tidey).  (D.E. 713-1)

> followed AAMA 511, correct?
>
> A.    That's correct.
>
> Q.    Okay.  And AAMA 511 you would agree is designed for the forensic water penetration testing of windows and doors.
>
> A.    That's correct.
>
> Q.    Which is something you do in your business, correct?
>
> A.    It is.
>
> Q.    You just didn't do it with respect to the SkySail project using AAMA 511, correct?
>
> A.    That's correct.

*Id.* at 18-19 (emphasis added) (quoting Barbour Dep. Vol. II 396:11-24) (D.E. 723).  The tests that Mr. Barbour did conduct are designed for *new* windows and doors, Stock Supply contends, and therefore are both irrelevant and misleading in this proceeding given that the tests were undertaken more than six *years* after the window and door installations.  According to Stock Supply, the relevant inquiry in a nutshell should at all times have been *why* the windows would leak, rather than "did they leak,"[7] and the fatal problem with the Barbour Report as it pertains to Stock Supply is that Mr. Barbour concludes simply, "they leak."  Without engaging in appropriate testing designed to determine *why* they leaked, Stock Supply argues, Mr. Barbour could not reach helpful and relevant conclusions that would assist a trier of fact.

The court, in keeping with its gatekeeper role under *Daubert* and Rule 702 of the Federal Rules of Evidence, now considers whether it must exclude the Barbour Report on grounds that it is not relevant with respect to Stock Supply's provision and installation of the windows and doors at SkySail.[8]  Rule 702 provides that

---

[7]Ultimately, the colloquy between counsel for New Bern and the court established that the question of *whether* the windows leak is a key issue as between Weaver Cooke and New Bern, while the question of precisely *why* the windows leak is a Weaver Cooke-Stock Supply issue.

[8] Stock Supply does not address whether Barbour may be "qualified and suitable to serve as an expert witness in other areas of this case for which he also has been designated by

14

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (construing Rule 702 and establishing parameters for application of rule).  Under *Daubert* and Rule 702, the court must determine that an expert's testimony is based on "scientific knowledge" and "will assist the trier of fact to understand or determine a fact in issue."  *Id.* at 592.  This two-pronged inquiry recently was summarized in the *In re Pella* litigation, wherein that court noted that the first inquiry asks "whether the reasoning or methodology underlying the testimony is scientifically valid," while "[t]he second inquiry "goes primarily to relevance....  Relevance is determined by ascertaining whether the evidence is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute."  *In re Pella Corp. Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation ("In re Pella")*, 214 F. Supp.  3d 478, 483 (D.S.C. 2016) (internal citation omitted), *construing Daubert*, 509 U.S. at 591-93; *see also Nease v. Ford Motor Company*, 848 F.3d 219, 228-29 (4th Cir. 2017) (discussing *Daubert* analysis).

In making a determination as to the admissibility of evidence, the court bears the responsibility of "ensuring that an expert's testimony both rests on a reliable foundation and is

---

Plaintiff."  Stock Supply Mem. in Support of Mot. to Exclude at 21.  In this order, the court limits the scope of its analysis to whether the Barbour Report is relevant as to Stock Supply.

relevant to the task at hand." *Daubert*, 509 U.S. at 597.  "Relevant" evidence is evidence that helps "the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591.  Thus, the proffered testimony must have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592, *quoted in Nease*, 848 F.3d at 229 (discussing relevance prong). The *Daubert* Court suggested that whether expert testimony is "sufficiently tied to the facts of the case," and thus will assist the trier of fact, may be considered in terms of its "fit":

> "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. ... The study of the phases of the moon, for example, may provide valid scientific knowledge about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Daubert*, 509 U.S. at 591-92 (internal citation omitted).  In this case, as the court noted during the July 2017 hearing, the dispositive *Daubert* issue is whether Mr. Barbour's testimony, as embodied in Exhibit K, is relevant to a determination of the facts at issue *vis-a-vis* Stock Supply.

Counsel for Weaver Cooke confirmed during the hearing that "the Barbour Report *is* what constitutes the evidence of proximate cause."  Within that report (here, "Exhibit K") are several passages wherein Mr. Barbour opines that the windows and doors as furnished and installed by Stock Supply do not meet industry standards or contractor's requirements and that all of them must be removed and replaced.  During the July 2017 hearing, the court called on counsel for New Bern and Weaver Cooke to direct the court's attention to the *exact* portions of the report that would support Weaver Cooke's position that Stock Supply proximately caused damages.  Counsel offered pages 5-9 of Exhibit K, which includes the portion captioned "Exhibit 1.2—Windows and Doors"

16

of the otherwise extensive Barbour Report, and directed the court to five passages in particular. These passages consist of paragraphs 3, 4, and 5 from the "Observations" section, and the paragraphs captioned "Analysis" and "Recommendations."  They provide:

3.  Water intrusion testing was performed at 2 windows, a hinged door and SGD. *Water intrusion occurred between the sash and frame at both windows.*  The testing was performed under adverse weather conditions (temperatures below 40 degrees) that would render the tests non-compliant under accepted standards.  However, results obtained were informative.  Water intrusion occurred during testing through and beneath the door pane and frame at the jamb and threshold at the SGD (see photographs 20-27).

4.  *The hinged doors and SGD's were not installed in accordance with the manufacturer's recommendations or the requirements of the contract documents.* The doors were not installed in pan flashing and the balcony traffic coating was not extended beneath the doors.  Traffic coating was applied from the balcony over the threshold, jambs and other components used to complete the door system.  No provision for drainage of water that bypasses the door frames was provided.  Gaps and defects were observed in the traffic coating at every SGD and hinged door observed (see photographs 7, 8, 15, and 16).

5.  Multiple SGD's were installed with single and double transom windows above. The multiple units were separated by light gauge framing to provide the structure for the wall.  The spaces between windows and doors were covered with a mull strip and metal wall panels.  *With these elements removed, the flashing and water proofing details were visible.  FortiFlash self-adhered flashing was used at the intersection of adjacent SGD's and between the doors and windows.  The flashing had not adhered to the substrate indicating primer required by the manufacturer was not used.  Additionally, the flashing was not properly lapped with the windows or other components as required to provide an effective weather barrier* (see photographs 11 through 15).

. . .

**Analysis**

Significant water intrusion has occurred at window and door units resulting in damage to interior finishes.  *Water resistence testing performed to date indicates the [SGDs], hinged doors and double hung windows as installed are not capable of preventing water intrusion under conditions prescribed by the contract documents or as required by standards within the industry*.  Qualitative observations indicate the windows and some doors are not capable of meeting air infiltration requirements prescribed by the contract documents.  Residential unit doors leading to the corridors were not supplied with gaskets as required by the contract documents.

17

**Recommendations**
*Remove and replace the double hung windows and SGD's.* Remove and reset the
hinged doors.  Install the new doors on a curb to allow space to properly correct the
balcony slope to drain.  Properly flash the units and integrate with other building
components including the weather resistive barrier and balcony traffic coating.
Install gaskets around the doors leading to the corridors from the residential units as
required by code and the contract documents.  No information regarding the
structural sufficiency of the cold formed metal framing between the window and
sliding glass door assemblies was available at the time this report was compiled. A
review of this element is necessary prior to implementation of any repairs.

Ex. K at 5-9.  The portions to which counsel directed the court's attention are in italics, and each was

thoroughly discussed during the hearing.  The court will address each in turn.

In paragraph 3, counsel for New Bern argued that this language "implicates a product issue."

While this may be, that language—indeed, the entire paragraph—has many implications and can be

interpreted in many different ways.  Here, the report does not establish that anything having to do

with Stock Supply's products or its installation of them played a causative role in the water

intrusion.  In paragraph 4, similarly, the report's observation that the doors were not installed in

accordance with contract documents and per the manufacturer's recommendations is not helpful or

relevant: As the report goes on to say, the doors "were not installed in pan flashing," which was

precluded by the improper slope of the balconies as installed by a different subcontractor, and, "the

balcony traffic coating was not extended beneath the doors," which was the responsibility of a

different subcontractor.  Nothing here suggests that it is probable at all (let alone "most probable")

that *Stock Supply's* products or its installation of them *caused* the damage complained of.  In

paragraph 5, the portions upon which counsel focused are not components of Stock Supply's scope

of work under the contract.  Instances of faulty flashing and/or weather-lapping may well affect the

performance of Stock Supply's products, but the Barbour Report's discussion of them is in no way

relevant to this court's determination of whether the water intrusion damages were caused by, and

18

are attributable to, Stock Supply.

Shortcomings of the same nature preclude counsel's cited provisions in the "Analysis" and "Conclusions" paragraphs from serving the purpose of providing helpful, relevant information to the court. The court sought to determine and specifically inquired of counsel whether, in these sections, Mr. Barbour "pinned it on Stock Supply." In fact, Mr. Barbour did not, and New Bern's counsel responded, accurately, that "what he's done is, [he's] identified a number of different defective conditions." While an identification of a number of possible causes of water intrusion may have been a relevant or useful tool to Mr. Barbour in his investigation, it is of no utility to this court in resolving the factual dispute of whether Stock Supply's work or products is one of those causes. Finally, in the concluding "Recommendations" paragraph where Mr. Barbour recommends that the windows and sliding glass doors be removed and replaced, the report gives no basis on which the court could conclude from it that Mr. Barbour recommends replacement of the windows and doors because of qualities in them, or in their installation, that are defective. The court could as easily conclude from this language that due to the convergence of *other causative factors* relating to the work of other subcontractors, the doors and windows are now damaged and require replacement for that reason. The court could conclude that the windows and sliding glass doors must be reinstalled simply because they couldn't remain in place while *other parties* undertake the various remedial measures recommended by Mr. Barbour, including correcting the balcony slope to allow proper drainage and properly flashing the units. Ex. K at 9.

The Barbour Report must be excluded on relevance grounds as to Stock Supply. The court agrees with Stock Supply that the testing undertaken by Mr. Barbour and recited in the Barbour Report could not lead a trier of fact to conclude that the most probable cause of water intrusion was

19

a faulty product and/or faulty installation, provided by Stock Supply. At most, the report includes Stock Supply's products and installation as *a possible* source, and *a possible* cause, of water intrusion. It establishes no more than that. It is for that reason not helpful, and not relevant, and will be excluded as to Stock Supply.[9]

Finally, the court holds that even if the Barbour Report were *not* excluded on *Daubert* grounds, and instead was admitted as evidence of proximate cause, Weaver Cooke's evidence still would be insufficient to satisfy its obligation of affirmatively demonstrating, with specific and admissible evidence, the existence of a genuine issue of material fact as to causation. Therefore, with or without the Barbour Report, Weaver Cooke cannot prove proximate cause as a matter of law; as a result, it cannot show negligence. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

As the court already has discussed, Weaver Cooke cannot establish that Stock Supply proximately caused any damages: Therefore, it cannot recover on its negligence-based contractual indemnity claim. "The pertinent indemnification provision 'requires that the damage be caused by the 'negligent acts or omissions' of the subcontractor.'" *Waterproofing Specialties, Inc. v. Weaver Cooke Construction, LLC*, No. 5;15-cv-00145-BR, Order at 14 (E.D.N.C. Jan. 4, 2017) (D.E. 1359). In deciding that appeal of one of the Related Orders, the district court noted that this court had found, as a matter of law, that Waterproofing Specialties' work on the pool deck was not defective; "i.e., it was not negligent." *Id.* at 14. Accordingly, the district court held, "in the absence of negligence, the bankruptcy court correctly determined that Weaver Cooke's indemnity claim based

_____

[9]In making this determination on relevance grounds, the court emphasizes that it does not undertake any analysis of the report's *reliability*, which would have a more direct application to other third-party defendants.

on WSI's pool deck work cannot survive." *Id.* at 14-15. Similarly, here, Weaver Cooke's inability to establish the elements of negligence as to Stock Supply is fatal to its indemnity claim, and Stock Supply is entitled to summary judgment on that basis.

## II.    Indemnity Provision Application

Moreover, an alternative ground for summary judgment exists: Weaver Cooke is precluded from seeking indemnification from Stock Supply based on its own undisputed contributory negligence. Ample evidence of record establishes, as a matter of law, that Weaver Cooke bears partial responsibility for the same negligence and damages that Weaver Cooke attributes to Stock Supply. *See* Indemnity Order at 16-17. Under the district court's more expansive reading of ¶ 16.2 of the parties' subcontract, Weaver Cooke is not precluded by § 22B-1 from seeking indemnity from other parties, including multiple subcontractors who may have been negligent.[10] However, to the

_____

[10]In the Order on Appeal, the district court held that Weaver Cooke was not precluded from seeking indemnity where "parties in addition to" the specific party against whom it sought to enforce the provision were negligent. Accordingly, recovery in indemnity is available to Weaver Cooke pursuant to its contractual indemnity provision with the third-party defendants, so long as Weaver Cooke seeks to recover in indemnity from those parties only to the extent of each party's sole negligence. The district court did not, however, directly address the implications of *Weaver Cooke's* contributory negligence vis-a-vis each party against whom it sought to enforce the provision, instead leaving that determination to this court.

This issue—whether the district court intended to include *Weaver Cooke* among these additional negligent parties—proved to be the subject of much debate among the parties, and prompted Stock Supply's motion for reconsideration and clarification. In its reply to Weaver Cooke's response in opposition to that motion, Stock Supply explained that it

moved the [district] Court "to clarify (1) the Court's interpretation of N.C. Gen. Stat. § 22B-1 and (2) the Court's application of § 22B-1 to the indemnification provision in Weaver Cooke's subcontract with Stock.... More directly, seeking clarity from the Court before the case returns to the bankruptcy court for further motion practice on the contractual indemnity issue, Stock moved the court to clarify the intent of its Order regarding "whether § 22B-1 precludes a promisor (here, Weaver Cooke) from obtaining indemnification from a promisee (here,

extent that Weaver Cooke bears responsibility (i.e. is contributorily negligent) for the damages *for which it seeks indemnity from Stock Supply*, § 22B-1 bars Weaver Cooke's recovery.

Section 22B-1 cannot be interpreted in such a way as to permit Weaver Cooke to recover from Stock Supply where the evidence of record establishes, as a matter of law, that Weaver Cooke was contributorily negligent as to Stock Supply.  "The indemnity provisions to which G.S. 22B-1 appl[ies] are those construction indemnity provisions which attempt to hold one party responsible

------------------------------

Stock) for any damages caused, in whole or in part, by Weaver Cooke's own negligence in the construction of the Skysail Project—even if Weaver Cooke can still pursue and obtain indemnity from "other parties" that may have been negligent relative to their own construction activities at the Skysail project."

Appellee's Reply to Appellant's Response in Opposition to Motion for Reconsideration and Clarification, No. 5:14-CV-537-BR) at 2-3 (E.D.N.C. D.E. 57) (original emphasis in bold deleted).

The district court simply found, as a matter of law, that the indemnity provision *as this court construed it* could not properly be applied to the facts of record.  Having found error with this court's construction of the contractual language, the district court remanded on that basis.  The district court thus did not opine on the issue of whether *Weaver Cooke's contributory negligence with respect to the party from whom it sought recovery in indemnity* would, under § 22B-1, preclude Weaver Cooke's recovery.  Nor did the district court need to do so, given that while this court had noted the fact of and summarized the uncontested evidence with respect to Weaver Cooke's contributory negligence, this court did not rest its holding on that basis.

In the Indemnity Order, this court concluded its discussion of ¶ 16.2 by noting that "[i]n sum, it is apparent that regardless of the extent to which the work done by other subcontractors played a causative role in the water intrusion problems at SkySail, and *regardless of the extent of Weaver Cooke's own role and fault, if any, in relation to the water intrusion problem*, Weaver Cooke can neither argue nor establish that Stock Supply is *wholly* responsible for the resulting damages."  Indemnity Order at 17 (emphasis in original) (D.E. 898).  Later in that same order, addressing Stock Supply's argument that Weaver Cooke's contributory negligence as to Stock Supply "bars any indemnity under § 22B-1, whether grounded in negligence, contract, or otherwise," this court again emphasized that "the contributory negligence of *any party* – including, obviously, Weaver Cooke – is acutely relevant to construction of the Subcontract." *Id.* at 21 (emphasis added).  The implications of Weaver Cooke's contributory negligence as to Stock Supply are now squarely before the court, and are addressed in this order.

22

for the negligence of another." *International Paper Co. v. Corporex Constructors Inc.*, 385 S.E.2d 553, 555 (N.C. App. 1989), *quoted in Bridgestone/Firestone, Inc. v. Ogden Plant Maint. Co. of N.C.*, 548 S.E.2d 807, 810 (N.C. App. 2001). "Under North Carolina law, a general contractor cannot require a subcontractor to insure it against its own negligent acts." *St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co.*, 187 F. Supp. 2d 584, 590 n.7 (E.D.N.C. 2000). When a contractor attempts to do so, as the *St. Paul* court noted, "any agreement relative to the construction of a building that purports to indemnify or hold harmless a general contractor against liability for damages arising out of bodily injury to a person [or damage to property] caused by or resulting from the general contractor's own negligence, in whole or in part, is against public policy and is void and unenforceable." *Id.* Here, to permit Weaver Cooke to require Stock Supply to indemnify Weaver Cooke for damages for which Weaver Cooke indisputably was partially responsible would ignore both the language and purpose of § 22B-1; indeed, it would be as if the statute, and the public policy it seeks to protect, did not exist. In light of Weaver Cooke's contributory negligence with respect to the damages for which it would seek indemnification from Stock Supply, Weaver Cooke is precluded from enforcing the indemnification provision against Stock Supply and summary judgment is granted to Stock Supply on this alternative ground.

## CONCLUSION

For the foregoing reasons, Stock Supply's Motion to Exclude the Expert Reports and Testimony of Plaintiff's Expert George Barbour as they Relate to Windows and Exterior Doors is **ALLOWED**. Stock Supply's Motion for Summary Judgment on the indemnification claim is **ALLOWED** on the alternative bases of lack of proximate cause and contributory negligence.

As was contemplated in the July 2017 hearing, any third-party defendant as to which the

court's Indemnity Order was remanded by one of the Related Orders may, within fourteen days from the date of entry of this order,  file a memorandum informing this court of that party's position as to the extent to which this order does or does not pertain to them, and raising remaining issues unique to them pursuant to the Related Orders, if any.  Weaver Cooke and/or New Bern will have fourteen days subsequent to any such filing in which to file a responsive memorandum.

**END OF DOCUMENT**